**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW S. JENKINS<br>777 Wallace Drive<br>Delaware, Ohio 43015<br><br>and<br><br>DEANNA L. JENKINS<br>777 Wallace Drive<br>Delaware, Ohio 43015<br><br>PLAINTIFFS,<br><br>v.<br><br>PAUL D. SWEENEY II<br>2252 State Route 646<br>Richmond, Ohio 43944<br><br>and<br><br>WEALTH WORKS, LLC<br>2252 State Route 646<br>Richmond, Ohio 43944<br><br>DEFENDANTS. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CASE NO. 2:26-cv-00997<br><br>JUDGE:<br><br>MAGISTRATE JUDGE:<br><br>***COMPLAINT***<br><br>***(JURY DEMAND ENDORSED HEREON)*** |

## COMPLAINT

Plaintiffs Matthew S. Jenkins and Deanna L. Jenkins, for their Complaint against Defendants Paul D. Sweeney II and Wealth Works, LLC, allege as follows:

## NATURE OF THE ACTION

1. This is an action by two investment-advisory clients against their former investment adviser representative, who converted a position of financial visibility and fiduciary trust into an instrument for his own business self-dealings and enrichment. Defendant Sweeney solicited his

client (Matthew Jenkins) to invest in Sweeney's own business venture, with Jenkins' money coming from within the advisory relationship Sweeney held with Jenkins. In doing so, Defendant Sweeney concealed his conflict of interest from his clients and from Sweeney's own public regulatory record, all while funding the business venture through his own discretionary liquidations of Plaintiffs' securities. In addition, upon information and belief, Sweeney also failed to disclose his conflict of interest to his own advisory firms. Then, when the business venture failed, Defendant Sweeney exploited his fiduciary knowledge of his client's personal finances in an attempt to extract an $80,000 exit payment and to shift Sweeney's personal lease-guaranty exposure onto his client, Matthew Jenkins.

2. Defendant Sweeney was Plaintiffs' licensed financial adviser, and he knew, from inside that relationship, that a substantial payout from Matthew Jenkins' business interests was coming. Sweeney received Matt Jenkins' money into accounts he controlled and supposedly "managed" ($885,311.24 wired on January 7, 2025). And within weeks, Defendant Sweeney began soliciting Matt Jenkins to invest in Sweeney's medical weight-loss clinic venture.

3. Sweeney knew that what he was doing was improper for a licensed financial advisor. By way of one example, Sweeney directed the business venture discussions to be had via an encrypted messaging application called Signal (and not through ordinary texts), telling Matt Jenkins in writing, "I'd like to keep it on here since it's encrypted."

4. Sweeney then used his written discretionary trading authority and his standing money-movement authority to route his clients' capital into the now failed business venture.

5. When the venture failed, Sweeney turned his fiduciary knowledge against his client, demanding an $80,000 payment from Matt Jenkins to exit, describing the business to Jenkins as "in a great place now." In addition, Defendant Sweeney contacted the landlord about a buyout of

the lease, advising the landlord that Jenkins "would have considerable assets to cover the personal guaranty." This alone, without more, is a breach of Sweeney's fiduciary duty owed to Matt Jenkins, as Sweeney used his knowledge of Jenkins' personal financial situation to gain an unfair advantage in his exit negotiations with Jenkins and the landlord.

6. Sweeney had also locked Matt Jenkins out of critical financial accounts (including but not limited to FreshBooks, QuickBooks, payment processors, and social media) to attempt to force Jenkins into Sweeney's proposed exit deal, all while Sweeney should have been acting as Matt Jenkins' trusted financial advisor.

7. The instant action arises from the investment-advisory relationship and from duties imposed by federal securities laws, the Ohio Securities Act, Ohio common law, and the obligations attendant to Sweeney's professional licensing. Plaintiffs do not seek to adjudicate the internal affairs of any limited liability company (including the failed business venture), the validity, interpretation, or breach of any operating agreement, or the respective rights and obligations of any company's members as such. The business venture is subject to separate business litigation filed by Sweeney in the Delaware County Court of Common Pleas, unrelated to Sweeney's investment advisor relationship with Plaintiffs.

8. In this action, Plaintiffs seek, among other things, compensatory damages; rescission of Matt Jenkins' purchase of the venture membership interest under R.C. 1707.43; statutory damages under R.C. 1707.42(B), including the consideration paid for Sweeney's advice and all loss due to that advice; forfeiture and disgorgement of all compensation and benefits Sweeney derived from Plaintiffs' assets and the advisory relationship; punitive damages; pre- and post-judgment interest; costs; and attorney fees.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

10. Plaintiff Matthew S. Jenkins is a citizen of the State of Ohio, residing in Delaware County. At all relevant times, Jenkins was an advisory client of Sweeney and a joint owner of the investment accounts described herein.

11. Plaintiff Deanna L. Jenkins is a citizen of the State of Ohio, residing in Delaware County. At all relevant times, Mrs. Jenkins was an advisory client of Sweeney and a joint owner, with rights of survivorship, of each investment account described herein.

12. Defendant Paul D. Sweeney II is a citizen of the State of Ohio, residing in Jefferson County. Sweeney holds Central Registration Depository ("CRD") No. 6289017 and was registered as a broker and investment adviser representative of Edward Jones from 2014 until July 7, 2025. Beginning in June 2025, Sweeney was a licensed investment adviser representative associated with Kingsview Wealth Management, LLC, operating from Kingsview branch offices at 600 Main Street, Wintersville, Ohio, and later 2203 Sunset Boulevard, Steubenville, Ohio.

13. Defendant Wealth Works LLC ("Wealth Works") is an Ohio limited liability company that Sweeney formed in or about August 2025. Upon information and belief, Wealth Works was the vehicle through which Sweeney received advisory compensation attributable to Plaintiffs' assets under management, and Wealth Works holds or has held the proceeds of that compensation. Wealth Works is named as a defendant as the knowing recipient and repository of those proceeds, against which Plaintiffs seek restitution, disgorgement, an accounting, and the imposition of a constructive trust.

14. Nonparty Edward D. Jones & Co., L.P. ("Edward Jones") is a Missouri limited partnership dual-registered with the SEC as a broker-dealer and investment adviser (CRD No. 250;

SEC No. 8-759; 801-3297) and a member of the Financial Industry Regulatory Authority ("FINRA"). From the inception of the advisory relationship in late 2024 until July 7, 2025, Sweeney acted as Edward Jones's registered representative and investment adviser representative with respect to Plaintiffs' accounts, using Edward Jones' name, its account and custodial platform, and its brokerage and fee-based advisory programs.

15. Nonparty Kingsview Wealth Management, LLC ("Kingsview") is an Oregon limited liability company and an investment adviser registered with the United States Securities and Exchange Commission ("SEC") (CRD No. 148107; SEC#:801-79198). At all relevant times from June 2025, Sweeney acted as Kingsview's investment adviser representative with respect to Plaintiffs' accounts, using Kingsview's name, his Kingsview email address (psweeney@kingsview.com), Kingsview's advisory-practice software, Kingsview's custodial platform at Raymond James & Associates, Inc. ("Raymond James"), and Kingsview's client disbursement channels.

16. Nonparty Thrive Medical Weight Loss, LLC (the "Thrive Venture") is an Ohio limited liability company organized on or about August 28, 2025, which operated a medical weight-loss clinic in Powell, Ohio. The Thrive Venture is Sweeney's creation, and, at its inception, Sweeney held a 51% membership interest and served as the Thrive Venture's self-appointed finance lead, opening and controlling its bank account and its books and records.

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331. Count One arises under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. In addition, jurisdiction over Count One is conferred exclusively by Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because those claims are so related to the federal claim that they form part of the same case or controversy.

19. This Court has personal jurisdiction over Sweeney because he is a citizen and resident of the State of Ohio, Sweeney resides in this judicial district, and because the conduct alleged occurred in this judicial district.

20. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2) and under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Sweeney resides in this judicial district and because a substantial part of the events giving rise to the claims occurred in this judicial district.

21. In connection with the acts alleged herein, Sweeney directly or indirectly used the means and instrumentalities of interstate commerce, including the mails, interstate wire and electronic communications, encrypted electronic messaging, the facilities of national securities exchanges, and the Automated Clearing House system in furtherance of his scheme to defraud Plaintiffs.

## FACTUAL BACKGROUND

22. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

23. In late 2024, Plaintiffs engaged Sweeney, then with Edward Jones, as their financial advisor. From the inception of the relationship, Sweeney had specific, intimate knowledge of Plaintiffs' complete financial and employment picture, including the structure and terms of Matt Jenkins' anticipated payout from his business interests, which Sweeney and Matt Jenkins discussed in November and December 2024, before Plaintiffs entrusted their life savings to Sweeney.

24. On January 7, 2025, Plaintiffs caused to be wired $885,311.24 into Plaintiffs' joint Edward Jones investment account. Plaintiffs opened two joint accounts with Sweeney as the financial advisor of record, with stated portfolio objectives of "Preservation of Principal" for one account and "All Equity Focus" for the other.

25. Sweeney entered the securities industry in 2014. He passed the General Securities Representative Examination (Series 7) and the Uniform Combined State Law Examination (Series 66) in April 2014 and the Securities Industry Essentials Examination in 2018. The Series 66 examination tests, among other subjects, the fiduciary obligations of investment adviser representatives, including the duties to identify, disclose, and obtain informed consent to conflicts of interest and to safeguard client confidences.

26. At all times relevant hereto, Sweeney was licensed and registered as an investment adviser representative or securities professional and was associated with firms registered under federal securities laws.

27. As a licensed professional exercising discretionary authority over client assets, Sweeney owed Plaintiffs fiduciary duties of care and of loyalty recognized under the Investment Advisers Act of 1940 and under Ohio law. The duty of loyalty required Sweeney to eliminate conflicts of interest or, at a minimum, to make full and fair disclosure of all material facts relating to any conflict and to obtain a client's informed consent before proceeding under a conflict of interest. His duties further prohibited him from using or disclosing, for his own benefit or to Plaintiffs' detriment, confidential information concerning Plaintiffs' finances acquired through Sweeney's advisory relationship with Plaintiffs.

28. Sweeney was under a continuing legal obligation to disclose his outside business activities on Form U4 and to keep that form current, ordinarily within thirty days of any change,

and to conduct client-related communications through channels subject to his firms' supervision and record-retention systems. These obligations exist for the protection of clients and the investing public.

29. Upon information and belief, Sweeney's firms maintained compliance programs and codes of ethics, as required under the federal securities laws, that required pre-approval of outside business activities, prohibited undisclosed business or financial transactions with advisory clients, and prohibited off-channel client communications. Upon information and belief, Sweeney periodically certified his compliance with those requirements.

30. By holding himself out to Plaintiffs as their licensed financial advisor and fiduciary, Sweeney continuously represented to Plaintiffs that his advice, his exercises of discretionary trading authority, and his exercises of disbursement authority were loyal, disinterested, confidential, and rendered in conformity with the legal and professional obligations described more fully above. In turn, Plaintiffs were entitled to rely, and did rely, on Sweeney's licensed professional status and on Sweeney's representations.

31. In mid-February 2025, a mere weeks after Plaintiffs wired $885,311.24 to investment accounts "managed" by Sweeney, Sweeney began to improperly solicit Plaintiff Matt Jenkins to invest in a medical weight-loss clinic venture during a trip to Florida (February 14–19, 2025). The solicitation occurred entirely inside the advisory relationship.

32. On or about February 26, 2025, Sweeney created a revenue forecast for the proposed clinic and shared it with Matt Jenkins that same day. At the time, Sweeney was a registered representative and investment adviser representative of Edward Jones, and, upon information and belief, Sweeney did not disclose the venture or the solicitation to Edward Jones, and the venture does not appear in any regulatory disclosure Sweeney has ever made.

33. In March 2025, Sweeney further induced Jenkins by providing an example, attributed to Sweeney's own accountant, of another weight loss clinic operator earning approximately $5 million per year, which was an anecdotal earnings claim supplied by Matt Jenkins' fiduciary as a reason to invest.

34. In late April 2025, Sweeney verbally demanded that the business venture discussions move to Signal, an encrypted messaging application believed to be outside his firm's supervision and record-retention systems. The first Signal message followed on May 1, 2025. On August 17, 2025, less than two weeks before Sweeney registered the Thrive Venture with the Ohio Secretary of State, Sweeney reiterated in writing that, "I'd like to keep it on here since it's encrypted." Sweeney thereby deliberately placed his dealings with his own advisory client beyond the supervisory systems that exist to protect clients.

35. On or around June 8, 2025, Jenkins left his employment, which was a decision on which Sweeney advised him. Sweeney provided no risk analysis or risk/reward information in connection with that advice, despite knowing that Plaintiffs' portfolio was already supporting substantial monthly withdrawals and despite simultaneously courting Matt Jenkins' capital for Sweeney's business venture. Despite promising to do so for his clients, at no time did Sweeney ever provide Matt Jenkins with any risk analysis of the Thrive Venture investment, notwithstanding Matt Jenkins' repeated requests for projections and a financial analysis.

36. In or around June and July 2025, Sweeney left Edward Jones (his registrations there ended July 7, 2025) for Kingsview and solicited Plaintiffs to transfer their accounts with him. On or about July 22, 2025, Plaintiffs' assets were transferred to advisory accounts custodied at Raymond James (associated with Kingsview).

37. On or about August 28, 2025, the Thrive Venture was organized under Ohio law, effectuated by Sweeney. At inception, Sweeney held a 51% membership interest, committed $104,000 in capital, developed the Thrive Venture's business model, prepared its financial projections, and opened and controlled its bank account.

38. From approximately February 2025 forward, Sweeney simultaneously occupied two roles, being (i) Plaintiffs' discretionary investment fiduciary, and (ii) the promoter, majority owner, and financial architect of the enterprise soliciting Matt Jenkins' capital investment. This was a material conflict of interest.

39. Plaintiff Matt Jenkins was personally aware of the fact of the business relationship itself, as he and Sweeney intended to go into business together. However, Matt Jenkins' own personal awareness does not constitute the disclosure required to render a client's consent informed. Sweeney's fiduciary status and licensure required him to disclose to Plaintiffs (a) that by reason of Sweeney's personal stake, his advice and his exercises of discretionary and disbursement authority respecting Plaintiffs' accounts could no longer be presumed disinterested; (b) Sweeney's personal economic interest in the size, timing, and source of Matt Jenkins' contribution, including that the Thrive Venture's launch depended on Jenkins' capital and that Sweeney's own majority position would be built in substantial part on his client's money; (c) that Sweeney had not informed his firms of the venture or the solicitation, and that the firm-level review and supervision designed to protect clients in precisely this situation was being bypassed; (d) that federal and state law and Sweeney's professional obligations required disclosure of the conflict and of the outside business activity, and that Sweeney was not making those disclosures; (e) that Plaintiffs should obtain independent financial and legal advice before committing their funds to Sweeney's Thrive Venture; (f) what an unconflicted adviser in Sweeney's position would have

been obligated to tell Plaintiffs, in that committing $98,000 of portfolio assets to a start-up venture, along with the abandonment of Jenkins' employment income, was unsuitable for a client drawing approximately $12,000 per month (for living expenses) from a diminishing portfolio; and (g) the tax and portfolio consequences of the securities liquidations timed to the Thrive Venture's funding.

40. Sweeney provided no written conflict disclosure, he obtained no informed written consent, and he never provided the risk analysis that full and fair dealing required.

41. Sweeney's concealment was knowing, deliberate, and selective. In August 2025, Sweeney amended his Form U4 outside-business-activity disclosures to add Wealth Works LLC, described as an "LLC for Kingsview Compensation" with a start date of "08/2025," while omitting the Thrive Venture. Sweeney thus demonstrated both his knowledge of the disclosure obligation and his choice to conceal the Thrive Venture from any required public disclosures.

42. Sweeney's own systems recorded the true character of the relationship throughout, as he scheduled Thrive Venture meetings through his Kingsview advisory scheduling software. Further, contemporaneous meeting records automatically generated by his advisory-practice software from September 29, 2025 through November 11, 2025 (covering the Thrive Venture's regulatory and business planning) classify Sweeney as "FINANCIAL ADVISOR" and Matt Jenkins as "Client." By Sweeney's own records, his dealings with Jenkins concerning the Thrive Venture were conducted within, not outside, the advisory relationship.

43. On August 15, 2025, Sweeney effected a discretionary sale of $17,000 of the Federated Hermes Prime Cash Obligations money-market fund ("PCOXX") in account No. 5750A724 (Trade No. 008488128). On August 20 and 21, 2025, $17,000 and $12,000 were disbursed from that account to Plaintiffs' bank through the adviser-disbursement channel.

44. On August 29, 2025, Sweeney effected two further discretionary sales in account No. 5750A724, one being a full liquidation of the PCOXX position for $184,505.34 (Trade No. 008348847), and the other being a sale of all 72 SPDR Gold Shares at $317.3906 per share for $22,852.12 (Trade No. 007867694).

45. During the third quarter of 2025, Sweeney effected 312 discretionary trades in account No. 4142F388, restructuring the transferred portfolio into a direct-indexing strategy that by design generates frequent discretionary transactions.

46. The Thrive Venture's capitalization then proceeded on a documented schedule. Sweeney deposited $50,000 into the Thrive Venture's bank account on October 27, 2025 and $54,000 on October 30, 2025. As for Jenkins' contribution, on October 24, 2025, Sweeney effected sixty-seven discretionary sales in account No. 4142F388 in a single trading day. Then, on October 27, 2025, $98,000.00 was journaled from account No. 4142F388 to account No. 5750A724 pursuant to instructions "authorizing your independent investment adviser representative to disburse funds." On October 31 and November 1, 2025, $98,000.00 was disbursed by ACH to Jenkins' bank, and on November 17, 2025, a $98,000.00 check from Jenkins' bank account was deposited into the Thrive Venture's bank account (an account that Sweeney opened and controlled).

47. Each securities transaction described herein was a purchase or sale of a "security" within the meaning of Section 3(a)(10) of the Exchange Act and R.C. 1707.01(B), effected by use of the means and instrumentalities of interstate commerce and/or the facilities of national securities exchanges. In connection with each transaction, Sweeney omitted to state (in fact, he fraudulently concealed) the material facts described herein that, as a fiduciary exercising discretionary authority, he was under an affirmative duty to disclose.

48. The concealed facts were material. A reasonable client would consider the advisor's promotion of, and majority ownership in, the enterprise that was the intended destination of account proceeds (and the advisor's concealment of that interest from his own firms and regulator) materially important to the decisions to grant and maintain discretionary authority, to permit the sales, and to authorize the disbursements so as to fund Sweeney's personal business venture. Plaintiffs did not know, and in the exercise of reasonable diligence could not have discovered, the concealed facts at the time of the transactions at issue.

49. On October 23, 2025, Jenkins formally acquired a 49% membership interest in the Thrive Venture for a capital contribution of $98,000, and Sweeney acquired a 51% membership interest for $104,000. The membership interest Jenkins purchased is a "security" under Ohio law, as R.C. 1707.01(B) expressly defines "security" to include "membership interests in limited liability companies."

50. The sale and disposition of the Thrive Venture membership interest to Jenkins was a "sale" within the meaning of R.C. 1707.01(C). Sweeney was the promoter and architect of the transaction, as he solicited Jenkins' investment beginning in February 2025. Sweeney created and supplied the revenue forecast, he supplied the third-party earnings anecdote, he structured the business venture, he prepared the financial projections, and he directed the funding mechanics through the advisory accounts he controlled of Jenkins. Sweeney thereby sold, caused to be sold, and participated in and aided every aspect of the sale of the membership interest to Jenkins.

51. The sale was procured by the fraudulent and unlawful conduct alleged herein, including but not limited to the affirmative misrepresentations, the concealment of the conflict of interest and of the facts described more fully herein, the omission of any risk analysis, and Sweeney's violations of his obligations as a licensed adviser under R.C. Chapter 1707.

52. Consequently, the purchase by Jenkins of a membership interest in the Thrive Venture is voidable at Jenkins' election under R.C. 1707.43.

53. The Thrive Venture saw its first patient on or around January 22, 2026. As the Thrive Venture's finance lead with control of its bank account and books, Sweeney knew of the precarious financial condition of the Thrive Venture. On January 10, 2026 (only twelve days before the first patient), Sweeney wrote to Jenkins as follows:

> Just an FYI, based on the money we have left in the account we have about 4 months left until we run out. This assumes no income.

54. In fact, Sweeney faced his own liquidity pressures at the time. In February 2026 he disclosed to Jenkins a $300,000–$400,000 renovation obligation for his advisory-practice building, for which Sweeney said he was "100% responsible." And, by March 2026, the Thrive Venture was incurring approximately $40,000 in monthly expenses against approximately $6,000 in revenue.

55. At 2:14 a.m. on April 2, 2026, Sweeney sent Jenkins a written demand to exit the Thrive Venture in exchange for a payment of $80,000 (almost a return of Sweeney's capital contribution), describing the business Sweeney privately knew to be failing as "in a great place now." That statement was false when made, and Sweeney knew it, as it contradicted Sweeney's own January 10, 2026 written admission, and the financial records were in Sweeney's control at the time.

56. Upon information and belief, the $80,000 figure was derived from Sweeney's fiduciary knowledge of the Jenkins' personal finances. Sweeney knew, from the investment accounts he managed and from the liquidations he himself had conducted, exactly what liquidity Plaintiffs had and what Matt Jenkins could be pressed to pay. Matt Jenkins ultimately did not pay the $80,000, and Sweeney subsequently withdrew from the Thrive Venture anyway, thereby

abandoning the sinking ship that Sweeney knew was failing. Sweeney's attempted extraction of more money from Jenkins was itself an attempted disposition of a security (the sale of Sweeney's membership interest) within R.C. 1707.01(C)), procured by a knowing misrepresentation of material facts.

57. The Thrive Venture's clinic location was leased under a five-year lease personally guaranteed by Sweeney, at Sweeney's own request. In October 2025, when the landlord required a guarantor, Sweeney proclaimed to Jenkins that Sweeney would need to be the guarantor because Jenkins apparently could not financially qualify (according to Sweeney).

58. On April 7, 2026, Sweeney emailed the landlord to discuss a buyout and "process." Within Sweeney's self-interested communications with the landlord, Sweeney advised the landlord that Matt Jenkins would have considerable assets to cover the personal guarantee.

59. Sweeney possessed Matt Jenkins' financial information solely by reason of the advisory relationship. Sweeney thus disclosed his client's confidential financial condition to a third party, without consent, to advance Sweeney's own interest in escaping his personal guaranty by positioning his client (Matt Jenkins) as a substitute guarantor.

60. On April 6, 2026, 45 discretionary sales were executed in account No. 4142F388.

61. At 8:00 a.m. on April 9, 2026, Plaintiffs terminated the advisory relationship in writing. Later that same day, 146 sales were executed in account No. 4142F388, each confirmed as a "DISCRETIONARY TRADE." Together with the April 6 sales, the two-day liquidation totaled 191 transactions with aggregate principal of approximately $238,092 and realized $27,890.37 in short-term capital gains, together with additional long-term gains.

62. The revenue forecast file with which Sweeney fraudulently induced Matt Jenkins' investment was modified by Sweeney after its February 26, 2025 creation. For specific examples,

on March 20, 2026 (as the Thrive Venture was failing) and on June 18, 2026 (the day Sweeney filed suit in Delaware County), Sweeney edited his initial revenue forecast.

63. The Thrive Venture did not return Matt Jenkins' capital contribution of $98,000, and Jenkins additionally paid rent and payroll obligations of the Thrive Venture. By June 30, 2026, the balance of Plaintiffs' investment account No. 4142F388 was $13.95.

64. Sweeney maintained exclusive ownership and control of the Thrive Venture bank account until January 2025, when Sweeney and Matt Jenkins met with the bank to allow Jenkins access and visibility to the Thrive Venture bank account. Sweeney continued to hold exclusive discretionary rights over Plaintiffs' investment accounts, the Thrive Venture bank accounts, and the transfer mechanisms regarding Matt Jenkins' purchase of a membership interest in the Thrive Venture.

65. As a direct and proximate result of the conduct and activities of Sweeney, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to (a) the $98,000 of Plaintiffs' funds deployed to the Thrive Venture, together with the rent and payroll payments described above, or, at Matt Jenkins's election under R.C. 1707.43, the full amount paid for the membership interest upon rescission; (b) the consideration paid for Sweeney's advice and all loss due to that advice, recoverable under R.C. 1707.42(B); (c) the tax cost of $27,890.37 in short-term capital gains realized in the April 2026 liquidation, including the post-termination transactions; (d) the fees and compensation attributable to Plaintiffs' assets that Sweeney received during the period of his divided loyalty; and (e) transaction losses and costs Sweeney caused during the relationship, including a $13,498.29 short-term loss and $1,085.57 in disallowed wash-sale losses arising from an unnecessary portfolio transaction Sweeney effected in 2025.

66. Sweeney, for his part, was unjustly enriched, as he received compensation attributable to Plaintiffs' assets, including payments made to and through Defendant Wealth Works LLC. Sweeney's transactions he consummated with Plaintiffs' money all occurred while Sweeney's conflict of interest remained concealed, and Sweeney attempted to extract a further $80,000 by fraud.

**COUNT I – VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND VIOLATION OF RULE 10b-5**

67. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

68. From approximately February 2025 through April 2026, in connection with the purchases and sales of securities in Plaintiffs' investment advisory accounts described above, Sweeney, directly and indirectly, by use of the means and instrumentalities of interstate commerce: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts that Sweeney was under an affirmative fiduciary duty to disclose and that were necessary to make his conduct and communications not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) and Rule 10b-5(a), (b), and (c).

69. The existence, nature, and implications of Sweeney's conflict of interest, as described more fully above, were omitted and concealed by Sweeney.

70. The fraudulent scheme perpetrated by Sweeney included the discretionary liquidations and disbursements synchronized to the Thrive Venture's funding, and, upon information and belief, the execution of 146 sales on April 9, 2026 after Plaintiffs had revoked Sweeney's authority in writing, constitute transactions that were deceptive for the additional and independent reason that they were unauthorized.

71. Sweeney acted with scienter. As a licensed professional trained and examined on the disclosure obligations at issue, Sweeney knew of his conflict and his duty to disclose it. His deliberate concealment is evidenced by, among other things, his contemporaneous, selective August 2025 Form U4 amendment to disclose his compensation vehicle while omitting the Thrive Venture from any public disclosure.

72. In addition, Sweeney's mandate of the Thrive Venture dealings and communications with Jenkins to be had within encrypted channels outside firm supervision are further evidence of Sweeney's scienter and his knowledge of the fraud he was perpetrating on Jenkins.

73. Because Plaintiffs' claim is predicated on omissions by a fiduciary under a duty to disclose, Plaintiffs' reliance is presumed. Plaintiffs did indeed rely on Sweeney's advice. Had the concealed facts been disclosed by Sweeney, Plaintiffs would not have maintained Sweeney's discretionary and disbursement authority as they did, they would not have permitted the securities sales described above to be used for the Thrive Venture's capitalization, and Plaintiffs would not have deployed $98,000 to the Thrive Venture.

74. Sweeney's fraud coincided with, and was in connection with, the purchases and sales set forth more fully above. Each discretionary sale was effected in furtherance of Sweeney's fraudulent scheme.

75. The concealed facts were material to Plaintiffs' decisions respecting the investment transactions, and the April 9, 2026 sales were themselves deceptive acts.

76. As a direct and proximate result of Sweeney's fraudulent conduct and material omissions, Plaintiffs suffered economic loss, including the losses described more fully above,

which were within the zone of risk concealed by Sweeney's omissions. Plaintiffs are entitled to recover their actual damages pursuant to Section 28(a) of the Exchange Act.

## COUNT II – BREACH OF FIDUCIARY DUTY

77. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

78. By reason of Sweeney's advisory relationship, the written grant of discretionary authority, the disbursement authority, Sweeney's licensed status, and Plaintiffs' reposed trust and confidence in Sweeney, Sweeney owed Plaintiffs fiduciary duties of undivided loyalty, full and fair disclosure, confidentiality, and reasonable care under Ohio law.

79. Sweeney breached those duties by, among other things, (a) soliciting his own advisory client, from inside the fiduciary relationship, to invest in Sweeney's own business venture, without the disclosures particularized above and without informed consent; (b) exploiting his fiduciary knowledge of Plaintiffs' finances (including the anticipated payout Sweeney discovered before the relationship's funding) to identify, cultivate, and further the solicitation; (c) advising Jenkins to abandon his employment income without any risk analysis, while courting capital to fund Sweeney's business venture; (d) directing the dealings onto encrypted channels (via Signal) to evade the firm supervision that exists for clients' protection; (e) concealing the Thrive Venture from his firms and from his public regulatory record; (f) using his fiduciary position to capitalize his own venture; (g) failing ever to provide a risk analysis despite repeated requests; (h) attempting, by a knowing misrepresentation and by exploitation of his knowledge of Jenkins' liquidity, to extract an $80,000 payment for Sweeney's own exit from the failing venture; (i) disclosing Matt Jenkins' confidential financial condition to the landlord, without consent, to position Jenkins as substitute guarantor and relieve Sweeney of his own guaranty exposure; and

(j) upon information and belief, executing 146 discretionary sales after his authority was revoked in writing.

80. A transaction in which a fiduciary has a personal interest is presumptively invalid under Ohio law, and the burden rests on the fiduciary to establish full disclosure and the intrinsic fairness of the transaction. Sweeney cannot establish either point.

81. As a direct and proximate result of Sweeney's conduct, Plaintiffs were damaged as alleged more fully above. Sweeney's conduct was undertaken with actual malice, or with a conscious disregard for Plaintiffs' rights, having a great probability of causing substantial harm, thereby entitling Plaintiffs to punitive damages and attorney fees. Sweeney's breaches additionally require the forfeiture and disgorgement of all compensation he or Wealth Works, LLC received during the period of Sweeney's disloyalty.

**COUNT III – FRAUD (MISREPRESENTATION AND FRAUDULENT CONCEALMENT)**

82. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

83. Sweeney made fraudulent representations of material fact to Plaintiffs, including: (a) the continuing express and implied representations, inherent in his holding himself out as Plaintiffs' licensed financial adviser and fiduciary, that Sweeney's advice and his exercises of discretionary and disbursement authority were loyal, disinterested, confidential, and rendered in conformity with his legal and professional obligations; (b) the February 26, 2025 revenue forecast he created and supplied, and the March 2025 third-party earnings account he supplied, as inducements to invest; and (c) his April 2, 2026 written statement that the Thrive Venture was "in a great place now."

84. Those representations were false when made, and Sweeney knew it or acted with utter disregard for their truth or falsity. Sweeney's advice and exercises of authority were

conflicted and self-interested, as Sweeney knew he was violating his disclosure and confidentiality obligations.

85. In addition, Sweeney's comment that the Thrive Venture was "in a great place now" contradicted his own January 10, 2026 written admission that the Thrive Venture had "about 4 months left until we run out," and the financial records in Sweeney's exclusive control.

86. Simultaneously, and as particularized move fully above, Sweeney concealed material facts he was under a duty to disclose. Sweeney's duty arises from his fiduciary relationship with Plaintiffs, from his licensure and professional obligations, and from his own partial statements, which required the whole truth to avoid being misleading.

87. Sweeney made the misrepresentations, and maintained the concealment, with the intent of misleading Plaintiffs into relying upon them. Sweeney intended to maintain his authority over Plaintiffs' assets, permitting the transactions alleged, deploying $98,000 to Sweeney's own business venture, and requesting that Jenkins pay Sweeney a further $80,000 to exit the failed venture.

88. Plaintiffs justifiably relied on Sweeney's misrepresentations and his concealment, as a client is entitled to rely on the loyalty, candor, and legal compliance of a licensed financial advisor and fiduciary. Plaintiffs' recorded lack of investment experience made that reliance all the more reasonable and foreseeable. Jenkins' refusal of the $80,000 demand does not diminish Sweeney's fraud; rather, it merely limited its success.

89. As a direct and proximate result of Sweeney's actions, Plaintiffs were injured as more fully described above.

90. Sweeney's fraud was committed with actual malice, entitling Plaintiffs to punitive damages and attorney fees.

## COUNT IV – FRAUD IN THE INDUCEMENT

91. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

92. Sweeney induced Jenkins' October 23, 2025 purchase of the 49% Thrive Venture membership interest for $98,000 by and through the misrepresentations and concealment specifically alleged above.

93. More specifically, the forecast, the earnings anecdote, the withheld risk analysis, the concealed conflict, and the continuing false representation of loyal, law-conforming advice were all made with knowledge of their falsity or with utter disregard for their truth or falsity.

94. As described more specifically and fully above, Sweeney intended that Jenkins rely on Sweeney's fraudulent misrepresentations and his fraudulent concealment.

95. Jenkins justifiably relied on Sweeney's misrepresentations and concealment and was thereby induced to purchase the membership interest in Sweeney's business venture, a venture that was doomed from the start.

96. As a direct and proximate result of Sweeney's actions, Jenkins was damaged in the amount of his $98,000 payment and consequential losses. In the alternative, Jenkins is entitled to rescission of the purchase and restitution of all consideration paid, with interest.

97. Sweeney's fraud was committed with actual malice, entitling Plaintiffs to punitive damages and attorney fees.

## COUNT V – CONSTRUCTIVE FRAUD

98. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

99. A confidential and fiduciary relationship existed between Sweeney and Plaintiffs, by reason of the advisory relationship, the grants of discretionary and disbursement authority,

Sweeney's licensed professional status, and the disparity of financial sophistication between the parties.

100. Sweeney breached the legal and equitable duties arising from that relationship, as more fully described above. Sweeney thereby obtained and sought advantages for himself, including but not limited to the capitalization of his venture with his advisory clients' funds, the retention of compensation attributable to his clients' assets, the attempted $80,000 exit payment, and the attempted transfer of his guaranty exposure.

101. Sweeney attempted to gain personal advantages for himself, to Plaintiffs' detriment, through conduct having a tendency to deceive and injure Plaintiffs, irrespective of any showing of moral guilt.

102. Sweeney's conduct constitutes constructive fraud under Ohio law.

103. As a direct and proximate result of Sweeney's actions, Plaintiffs were injured as more fully described above, and the transactions procured by Sweeney's conduct are voidable at Plaintiffs' election, with all benefits Sweeney derived therefrom subject to disgorgement and constructive trust.

104. Sweeney's constructive fraud was committed with actual malice, entitling Plaintiffs to punitive damages and attorney fees.

## COUNT VI – NEGLIGENT MISREPRESENTATION

105. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

106. In the alternative, in the course of a relationship in which Sweeney had a pecuniary interest, Sweeney supplied false or misleading information for Plaintiffs' guidance in their own financial decisions.

107. The false and misleading information supplied by Sweeney includes but is not limited to Sweeney's revenue forecast, the earnings anecdote, the representations of disinterested and law-conforming advice, and the "in a great place now" characterization.

108. Sweeney's false and misleading statements were made without exercising reasonable care or competence in obtaining or communicating that information, and Sweeney omitted the risk analysis that reasonable care required.

109. Plaintiffs justifiably relied on that information and suffered pecuniary loss as described more fully above.

110. Sweeney's false and misleading statements were committed with actual malice, entitling Plaintiffs to punitive damages and attorney fees.

**COUNT VII – VIOLATIONS OF THE OHIO SECURITIES ACT, R.C. CHAPTER 1707 (RESCISSION AND STATUTORY DAMAGES)**

111. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

112. The Thrive Venture membership interest Jenkins purchased is a "security" under R.C. 1707.01(B), which expressly includes "membership interests in limited liability companies."

113. The disposition of that membership interest to Jenkins, and Sweeney's attempted disposition of his own interest to Jenkins for $80,000, were each a "sale" or attempted sale within R.C. 1707.01(C).

114. The securities transactions Sweeney effected in Plaintiffs' advisory accounts were likewise purchases and sales of securities under Ohio law.

115. Sweeney's conduct more particularly described above violated R.C. 1707.44, including without limitation (i) R.C. 1707.44(B)(4) (knowingly making false representations of material and relevant facts for the purpose of selling securities in this state, which include the forecast, the earnings anecdote, and the "in a great place now" statement); (ii) R.C. 1707.44(G)

(knowingly engaging, in purchasing or selling securities, in acts and practices declared illegal, defined as fraudulent, or prohibited); and (iii) R.C. 1707.44(M) (fraudulent, deceptive, and manipulative acts, practices, and courses of business by an investment adviser representative upon his clients, including the concealed conflict, the self-interested use of discretionary authority, and the misuse of client confidences).

116. Under R.C. 1707.43(A), the sale of the membership interest to Matt Jenkins, having been made in violation of Chapter 1707, is voidable at Jenkins' election. Defendant Sweeney, as the seller-side principal and as a person who participated in and aided the sale in every respect, is liable to Matt Jenkins, upon tender of the interest, for the full amount paid, together with all taxable court costs and interest.

117. Under R.C. 1707.42(B), Sweeney, having acted as an investment adviser representative in violation of Chapter 1707, is further liable to Plaintiffs for the damages resulting from Sweeney's violations, including the consideration paid for his advice, any loss due to the advice, and all court costs.

**COUNT VIII – UNJUST ENRICHMENT (DISGORGEMENT AND ACCOUNTING)**

118. Plaintiffs incorporate the foregoing paragraphs as if fully rewritten herein.

119. Plaintiffs conferred direct benefits on Sweeney, including but not limited to compensation attributable to Plaintiffs' assets under management (including amounts routed through Wealth Works LLC), and, upon information and belief, transition or recruitment compensation tied to Plaintiffs' transferred assets.

120. Sweeney had personal knowledge of the benefits conferred on him by Plaintiffs, and Sweeney retained these benefits during a period of concealed disloyalty under circumstances in which retention without payment would be unjust.

121. Plaintiffs are entitled to restitution and disgorgement of all such benefits, to an accounting of all compensation and benefits Sweeney derived from Plaintiffs' assets and the advisory relationship, and to the imposition of a constructive trust on the proceeds thereof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Matthew S. Jenkins and Deanna L. Jenkins respectfully request that they be awarded damages against Defendant Paul D. Sweeney II as follows:

(a) Compensatory damages in an amount in excess of $150,000 plus compensatory damages more fully described above, to be proved at trial;

(b) At Plaintiff Matthew Jenkins' election, rescission of the purchase of the Thrive Venture membership interest pursuant to R.C. 1707.43, with recovery, upon tender of the interest, of the full amount paid, together with all taxable court costs and interest;

(c) Statutory damages pursuant to R.C. 1707.42(B), including the consideration paid for Sweeney's advice, all loss due to the advice, and all court costs;

(d) Forfeiture, restitution, and disgorgement of all compensation and benefits Sweeney derived from Plaintiffs' assets and the advisory relationship, including compensation paid to or through Wealth Works LLC, together with an accounting thereof and the imposition of a constructive trust on the proceeds;

(e) Punitive damages in an amount in excess of $100,000;

(f) Attorney fees and all costs or expenses;

(g) Pre- and post-judgment interest; and

(h) Any other relief this Court deems appropriate at law or in equity.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN, LPA**

*/s/ Matthew T. Anderson*
Matthew T. Anderson (0082730)
Andrew J. Lichtman (0103575)
1160 Dublin Road, Suite 400
Columbus, Ohio 43215
Telephone: (614) 221-7663
Facsimile: (866) 345-4948
E-mail: manderson@LNLattorneys.com
E-mail: alichtman@LNLattorneys.com
*Attorneys for Plaintiffs Matthew S. Jenkins and Deanna L. Jenkins*

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

*/s/ Matthew T. Anderson*
Matthew T. Anderson (0082730)